[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-11264

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 30, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-00104 CV-DF-3

PAMELA GARRETT, individually,
f.n.a. Eric William Irby,
f.n.a. Valerie Nicole Irby,

                                        Plaintiff-Appellee,

        versus

ATHENS-CLARKE COUNTY, GEORGIA,
ATHENS-CLARKE COUNTY POLICE DEPARTMENT, et al.,

                                        Defendants,

RAYMOND VON ANDERSON, II, individually,
and in his official capacity as a Police Officer
with the Athens-Clarke County Police Department,
DONALD ECKERT, individually and in his
official capacity as a Police Officer with the
Athens-Clarke County Police Department,
RYAN MCGEE, individually and in his official
capacity as a Police Officer with the Athens-
Clarke County Police Department, LLOYD
NASH, individually and in his official capacity
as a Police Officer with the Athens-Clarke County
Police Department,

                                        Defendants-Appellants.

---

Appeal from the United States District Court
for the Middle District of Georgia

---

**(July 30, 2004)**

Before EDMONDSON, Chief Judge, BIRCH and FARRIS[*], Circuit Judges.

PER CURIAM:

Four police officers of the Athens-Clarke County, Georgia, Police

Department -- Raymond Von Anderson, Donald Eckert, Ryan McGee, and Lloyd

Nash -- appeal the denial of their motion for summary judgment on claims for

excessive force under the Fourth Amendment made against them in their

individual capacities. We reverse and remand for further proceedings.

Facts[1]

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]In reviewing defendants' motion for summary judgment, we resolve all issues of material fact in favor of plaintiff: the nonmoving party. See Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003). So where there are conflicting reports of facts in the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, we accept the version most favorable to Eric William Irby.

2

At approximately 4:00 a.m. on 19 June 1997, Officer Cleveland[2], of the Franklin Springs Police Department, was on routine patrol when he noticed a red pick-up truck with a burned-out taillight. Eric William Irby was driving the truck; Roy C. Hutchinson was in the passenger seat. Cleveland began to follow the truck and noticed that the truck was weaving between lanes and having trouble negotiating curves in the roadway. At this point, Cleveland suspected the driver was under the influence. He followed the truck for three-quarters of a mile and tried to get to a lighted area to stop the truck. The truck slowed down as if to stop but did not. Cleveland then turned on his lights and siren. Cleveland signaled the truck to pull over and radioed the dispatcher to say he was making a traffic stop.

Irby did not pull over. Instead, Irby led Cleveland on a highspeed chase at speeds of up to 75 miles per hour. The chase eventually covered 30 miles and went through Franklin, Madison, and Athens-Clarke counties. Officers Buffington (of Royston Police Department), Phillips (of Franklin County Sheriff's Department), and Carr (of Madison County Sheriff's Department) joined in the chase.

The officers attempted to end the pursuit by using rolling roadblocks and other maneuvers, but Irby avoided all of those devices. Irby continued to weave

[2]Officers Cleveland, Buffington, Phillips, and Carr are not parties to this appeal.

3

over the road to prevent the officers from passing.  At one point, Irby turned off

Highway 29 onto Highway 174, lost control of his truck, hit a mailbox, and ran

into a ditch.  This incident did not end the chase.  Irby drove on.  Officer Phillips

joined the chase as the vehicles were approaching him.  Phillips got in front of the

truck to attempt to slow it down.  When he saw Irby try to turn onto another road,

Phillips bumped him with the left front corner of the police car to get Irby to spin

out, but that failed.

Irby continued to lead the chase until Officer Phillips again got in front of

the truck.  Phillips slowed down in an effort to get Irby to stop.  Irby wove across

the road in an attempt to get around the police car.  Irby tried to pass Phillips on

the right-hand side in a ditch but spun out and went backwards in the opposing

lane of traffic before going back into the ditch on Highway 106.  Irby's truck came

up out of the ditch and rammed Phillips's patrol car.  Ramming the patrol car

knocked Irby's truck back down into the ditch.

In the ditch, the motor vehicle chase finally ended, around 5:00 a.m., in

Athens-Clarke County.  Officer Cleveland got out of his car and ran to the

passenger side of the truck.  He tried to open the door, but it was locked.

Cleveland ordered the passenger Hutchinson to exit the truck, but Hutchinson

protested and refused to comply.  Cleveland reached inside the truck, unlocked the

4

door, and pulled Hutchinson out. Cleveland struggled with and handcuffed Hutchinson.[3]

Non-defendant Officer Carr approached the driver's side of the truck, gun drawn. Irby was still attempting to get his truck out of the ditch, spinning the tires. The back tires were in a rut in the bottom of the ditch, and the truck lacked traction to come up the hill. Officer Carr told Irby five or six times to turn off the truck's motor. Irby finally complied. Carr then told Irby to get out of the truck, but Irby refused. After repeating his commands several times, Carr opened the driver's side door and ordered Irby to get out of the truck and to let Carr see Irby's hands to ensure Irby had no weapons. Irby neither freely showed his hands nor obeyed Carr's commands to get out of the truck.

Carr finally reached into the truck to pull Irby out. But Irby leaned backwards towards the passenger side, making it hard for Carr to grab his hands. After several tries, Carr was able to grab Irby and to pull him out of the truck, grabbing Irby's right wrist with his left hand while Carr kept his gun in his right hand close to his chest.

---

[3]Hutchinson was held at Franklin County and later released on bond. He later disappeared, and no statement from him about the events that occurred that evening is in the record.

Irby started screaming as Carr pulled him out of the truck. (Carr describes Irby as screaming as if Irby were trying to pump himself up to get his adrenaline flowing.) Irby's left hand grabbed the slide on Carr's pistol, and Irby tried to pull Carr's pistol away from Carr, pushing the officer down the ditch with significant strength. Carr has said he felt overpowered. But Carr was finally able to twist his own arm and get the police weapon away from Irby. Carr, feeling his life was in danger, hit Irby on the top of the head with the butt of his gun one time.[4] Carr then took a defensive stance and drew down on Irby. Irby did not freeze. Irby looked at Carr, screamed again (in the pumping-up manner similar to that previously described by Carr), and ran into the grassy field behind the truck.

When Irby ran up the hill, Carr saw Irby had no weapon in his hands; so Carr holstered his gun and pulled out his baton and chased after Irby. Carr yelled to Irby to stop and to get on the ground. Irby said, "You're not going to catch me, old man," and continued running. Irby would not stop; so Carr hit him in the upper backside of one of Irby's thighs. Carr hit Irby three times, before Irby fell to the ground. Carr dove on top of Irby to keep him from getting up. At this point,

---

[4] Several of the officers said that at this point Carr's gun discharged (but the bullet did not hit anybody). Officer Phillips said he thought the gun discharged while Irby was already running in the field, although he did not see the shot fired. The defendant officers were not yet on the scene, and this matter is not a genuine dispute of material fact for purposes of this specific appeal.

6

Officer Phillips showed up and helped Carr to handcuff Irby. Even after being handcuffed, Irby continued to resist. Irby yelled that the officers were going to have to kill him to take him.

As the officers got Irby to his feet to walk him out of the field, Irby kept kicking, swinging, yelling, and fighting, trying to push and drag the officers. Carr hit Irby on the back of the thigh again to get Irby to go down, to no avail. Officer Buffington came over to help. Buffington gave Phillips a second pair of handcuffs. One of the cuffs was put on Irby's wrist and Phillips pulled on the open cuff, trying to lead Irby away from the field. Phillips put his flashlight in the empty part of the second cuff to get more control, but Irby still resisted. Then, Irby kicked Officer Phillips in the chest; and both Irby and Phillips fell to the ground: Irby on top of Phillips. Then, the officers dove on top of Irby to hold him to the ground. Irby got control of Phillips's flashlight, but the officers stopped him from attacking with it. Irby continued his resistance with further fighting and kicking.

At this point, defendant officers Von Anderson, Eckert, McGee, and Nash arrived on the scene. Officer Eckert brought a nylon strap (hobble cord) he had

with him;[5] when Officer Eckert arrived on the scene, Officer Nash told Eckert that police officers were in the field, the suspect (Irby) was still fighting, and the officers were requesting leg restraints. Officer Eckert retrieved the hobble cord and brought the strap over to Irby's location and attempted to apply the restraint. Irby violently resisted by kicking. He bruised Officer Eckert in the process.

Officer Buffington then gave Irby a verbal warning to stop kicking or Irby would be sprayed with pepper spray ("OC spray"). Irby did not stop kicking. After attempting to get control over Irby's legs and failing because of Irby's kicks, Eckert told Buffington to go ahead and pepper spray Irby. Buffington applied the OC spray to Irby and helped Carr overpower Irby. Irby moaned and at this point became compliant. Without delay, the officers helped Eckert fetter Irby: his ankles were tied together, his hands were cuffed together behind his back, and his hands and feet were strapped together so that the distance between Irby's wrists and ankles was fewer than 12 inches, causing his body to be bowed.[6] The officers

---

[5]A hobble cord is a nylon strap with a metal snap at one end that can connect to a pair of handcuffs and a permanent loop on the other end, that can secure ankles, knees, or elbows.

[6]The district court uses the word "hog-tie" to describe this means of securing Irby. For the purposes of this appeal, we use the word "fetter" instead of "hog-tie." By the way, even at the summary judgment stage, it is not plain to us that sufficient evidence exists in the record to establish that Irby's hands and feet were bound fewer than 12 inches apart. The district court does not call our attention to the evidence supporting that view, nor does appellees' brief. But for the sake of discussion, we accept the district court's description of how Irby was bound.

carried Irby to a place behind Officer Cleveland's car. The car was running, and Irby was on his chest near its exhaust pipe. Von Anderson turned Irby's head to the side and made sure that Irby had a pulse (which he did). Irby did not complain about the OC spray, and no one decontaminated him with water.

An ambulance was immediately called and arrived minutes later. Paramedics found Irby fettered and lying in a prone position. The paramedics detected no pulse. Irby was taken to Athens Regional Medical Center where he was declared dead. Dr. Koponen, the Deputy Chief Medical Examiner at the Georgia Bureau of Investigations, performed an autopsy and listed the cause of death as "positional asphyxia." The autopsy said the injury to Irby's head was "very superficial." The report found methamphetamine and amphetamine in Irby's system and listed them as contributing factors of death. Neither OC spray nor carbon monoxide were listed as contributing factors of death.

Pamela Garrett -- Irby's mother -- brought suit against defendants for wrongful death and deprivation of civil rights.[7] The district court granted defendants' motions for summary judgment on all claims, except plaintiff's § 1983

---

[7]Garrett brought suit in her individual capacity, as next friend and administratrix of the estate of Irby, and as next friend and legal guardian of Valerie Irby, Irby's daughter. For purposes of this appeal, we refer to Garrett as a single plaintiff.

individual capacity claims for use of excessive force.[8]  Defendants appeal the denial of summary judgment.

## Discussion

Qualified immunity can protect officers "acting within the scope of [their] discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  To determine whether an officer is entitled to qualified immunity, we engage in a two-step analysis.  Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001).  First, we decide whether defendants' acts violated the Constitution.  Id.  Second, we ask whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law.  Id.

That the officers in this case were acting within the scope of their discretionary authority is undisputed.  Thus, we turn to whether defendants, given the circumstances, violated a constitutional right of Irby's.

---

[8]The Unified Government of Athens-Clarke County, Georgia is also a defendant.  The district court granted summary judgment on all claims against the Unified Government, except the § 1983 claim for failure to train its officers adequately.  The Unified Government is not a party to this appeal.

Plaintiff argues that defendants violated Irby's constitutional right under the Fourth Amendment[9] to be free from the use of excessive force in the course of an arrest. Plaintiff appears to argue that defendants' fettering of Irby was excessive for two reasons: (1) the restraint has a high potential of resulting in death when applied to a person in Irby's condition at the time of the incident; and (2) the restraint was unnecessary in the light of Irby's compliance after having been sprayed with OC spray.[10]

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 109 S.Ct. 1865, 1871-72 (1989). So, we analyze whether defendants used excessive force by determining whether "the officers' actions are 'objectively

---

[9]The Supreme Court has held that the Fourth Amendment was incorporated against the states by the Fourteenth Amendment. See Ingraham v. Wright, 97 S.Ct. 1401, 1414 n.42 (1977).

[10]Plaintiff adamantly rejects the notion that Irby's death is critical to her claim of excessive force: plaintiff argues that the claim would be the same even if Irby had not died. But plaintiff does note that Irby's death and its cause are relevant to the question of damages, should plaintiff prevail on her claim.

reasonable' in light of the facts and circumstances confronting them."[11] Id. at

1872. We judge the officers' acts

> from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

Id. at 1872 (citations omitted).

In analyzing whether Irby's constitutional right was violated, we look at the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Lee, 284 F.3d at 1197-98 (quotation and citation omitted).

Plaintiff first argues that fettering Irby was excessive force because the fettering posed a high potential of death, but plaintiff does not point us to

---

[11]Defendants argue we should analyze the excessive force claims under the rubric of the Fourteenth Amendment, not the Fourth Amendment. We disagree. The excessive force claims arise from events happening in the course of the arrest. "[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham, 109 S.Ct. at 1871 (emphasis omitted). Although the line is not always clear as to when an arrest ends and pretrial detainment begins, the facts here fall on the arrest end. See Gutierrez v. City of San Antonio, 139 F.3d 441, 452 (5th Cir. 1998) (stating Fourteenth Amendment analysis does not begin until "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time") (quotation and citation omitted).

12

competent evidentiary support for that argument. And in our review of the expert medical testimony in this case, we have found no statement quantifying -- or even attempting to quantify -- the risk of death posed by fettering.[12] No competent evidence in this case supports the view that death or serious injury is a likely consequence of fettering a person as Irby was fettered.

Plaintiff does offer expert police testimony and additional materials in an effort to show that a reasonable officer would have known that fettering has a high risk of death for certain persons. But that evidence *presumes* that fettering is a dangerous practice: that evidence does not -- and cannot -- establish that fettering *in fact* poses a high potential for death or serious bodily injury.[13] Unlike the risk of death from firearms, the risk associated with fettering is not of such common knowledge that we could notice -- without expert medical testimony -- that fettering does indeed pose a high risk of death.

---

[12]For plaintiff's medical experts to testify that fettering a person poses some risk of death is not enough. Almost every use of force, however minute, poses some risk of death. See Vera Cruz v. City of Escondido, 139 F.3d 659, 661 (9th Cir. 1998). But that does not make all use of force unreasonable. Furthermore, plaintiff's argument itself relies on the proposition that the fettering carried with it a *high* risk of death.

[13]Furthermore, plaintiff does not dispute defendants' argument that the additional materials (mostly police publications and police policies from other jurisdictions) are inadmissible under Federal Rule of Evidence 703. Instead, plaintiff states that they are offering the materials only for notice. Because the materials are not offered for the truth of their content, they cannot establish that fettering poses a risk of death.

Without expert medical testimony quantifying to some degree the risk of death or serious bodily injury, plaintiff cannot establish that fettering under the circumstances in this case posed a high risk of death. Therefore, we conclude that plaintiff's first argument on excessive force fails for lack of sufficient evidence.

Plaintiff next argues that the fettering (whether highly dangerous or not) was unnecessary because of Irby's compliance after having been sprayed with OC spray. Plaintiff adds that the force was particularly excessive after Irby's compliance in the light of his extended struggle, head wound, and exposure to OC spray without decontamination. Reviewing the evidence before us, we see no constitutional violation. As we have noted, defendants do not use excessive force if they act in an "objectively reasonable" manner in the light of the facts and circumstances before them. Graham, 109 S.Ct. at 1872. In context, the force used by defendants was within the range of reasonably proportionate responses to the need for force and was not excessive.

The district court said that defendants used unconstitutionally excessive force against Irby because they fettered him after he was made compliant by the OC spray. We disagree. In analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story.

Irby repeatedly placed officers' lives and innocents' lives in danger by engaging the police in a multi-county vehicle chase that did not end until Irby had crashed *twice*. Once Irby's truck was finally stopped, the officers tried to restrain him in a less restrictive manner (simple handcuffing), but Irby ran and fought with the police and kept on violently kicking and resisting. The uncontroverted evidence in the record shows that legs can still be used to kick, even when the ankles are bound together. Therefore, it can be necessary to restrain further or secure the legs to avoid a power kick from the ground.

Irby kicked violently until sprayed with the OC spray. As soon as he was sprayed and became compliant, the officers immediately fettered him. They took advantage of a window of opportunity -- of unknown duration -- to restrain Irby in such a way that he could not harm another officer or himself should he decide to stop being compliant, a realistic possibility given his recent words and deeds.

Again, we must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene. From the scene, we have a man who for a considerable time has consistently put his life and the lives of others in danger and who has shown that he has every intention of fighting and forcibly escaping arrest if possible. We cannot say the defendants' acts were beyond the outside borders of objective reasonableness given all the circumstances. See

Cottrell v. Caldwell, 85 F.3d 1480, 1488, 1492 (11th Cir. 1996) (concluding officers did not use excessive force, although arrestee died of positional asphyxia, where officers placed arrestee in handcuffs and leg restraints after a 20-minute struggle and put him in a prone position in the back of a police car); Fernandez v. City of Cooper City, 207 F.Supp.2d 1371, 1379-80 (S.D. Fla. 2002) (saying arrestee's death by positional asphyxia was not the result of unconstitutionally excessive force by officers, but was rather the result of arrestee's "illegal, physical, and prolonged resistance").

After considering all of plaintiff's arguments, we conclude that, as a matter of law, defendants did not violate Irby's Fourth Amendment right to be free from excessive force. Even so, out of an abundance of caution, we also conclude that qualified immunity would apply even if the defendants had violated Irby's rights: no controlling case law had settled the applicable law; and given the circumstances, defendants' acts were not so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer, facing the circumstances, would have known that the acts violated the pre-existing federal law.

REVERSED AND REMANDED.