[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-11619
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 9, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 02-00125 CV-WLS-1-1

ARRID BALTIMORE,

                                                            Plaintiff-Appellee,

versus

CITY OF ALBANY, GEORGIA, et al.,

                                                            Defendants,

JOSEPH RIZER,
Individually and in His Official Capacity,
A.J. LONG,
Individually and in His Official Capacity,
VICTOR SINGLETON,
Individually and in His Official Capacity,

                                                            Defendants-Appellants.

_____

Appeal from the United States District Court
Middle District of Georgia
_____

**(June 9, 2006)**

Before EDMONDSON, Chief Judge, and TJOFLAT and KRAVITCH, Circuit Judges.

PER CURIAM:

This is an "excessive force" case. The plaintiff contends that officers of the Albany, Georgia police department used excessive force, in violation of the United States Constitution, in arresting him during a disturbance near an Albany night club. This interlocutory appeal questions whether the district court erred in refusing, on motion for summary judgment, to grant three of the officers qualified immunity from suit. We conclude that two of the officers are entitled to such immunity and therefore reverse the district court's judgment as to them. We affirm the judgment as to the remaining officer.

I.
A.

The police-citizen encounter in this case occurred in the evening of June 24, 2000.[1] Arrid Baltimore ("Baltimore") and his brother, Saran Baltimore, met at Saran's home around 7:00 p.m. to watch the Mike Tyson-Lou Savarese boxing match. When the fight was over, they left in separate cars to attend an "after-party" at a local club, Charlie and Diane's Lounge. En route to the club,

---

[1] In determining whether the officers are entitled to qualified immunity, we consider the evidence, and recite the facts, in the light most favorable to the plaintiff.

2

Baltimore stopped at a convenience store and bought a quart bottle of grapefruit juice. He arrived at the club shortly after his brother got there, and parked down the street. It was close to 11:00 p.m.

As Baltimore walked toward the club, he saw a crowd, which included several of his acquaintances, standing in the front yard of a house adjacent to the club. He heard someone suddenly yell that the police were coming. Cpl. Joseph Rizer and his riding partner, Officer Ire Hornsby, who were on patrol, saw the crowd, which appeared to be unruly, shouting and cursing, and stopped to investigate. Before exiting their patrol car, they called for back-up due to the size of the crowd. As Cpl. Rizer approached the gathering, he saw Baltimore carrying the bottle of grapefruit juice and thought he might be violating the City of Albany's open container law.[2] Rizer drew next to Baltimore to explain the open container law, and as he did, the crowd grew closer and began to turn hostile. So, Rizer decided to remove Baltimore to his patrol car. By this time, the back up,

---

[2] The City's open container ordinance, Albany City Code § 4-13(b)(1), made it unlawful for "any person to have in his or her possession any alcoholic beverages in an open container while on the public streets, sidewalks, or rights-of-way, or in any public or semi-public parking facility within the City of Albany." A violation is a misdemeanor punishable "by a fine not to exceed five hundred dollars ($500.00) or by imprisonment . . . or . . . compulsory labor on the streets or public works not to exceed one hundred eighty (180) days[,] or by both fine and imprisonment or labor." § 1-17(a). Cpl. Rizer thought that the bottle of grapefruit juice Baltimore was carrying might be "spiked" with gin, which, his experience had taught him, was commonly mixed with grapefruit juice.

Cpl. Richard Vanstone and Officer Andrew Long, had arrived and parked next to Rizer's patrol car. Baltimore told Rizer that the bottle he was carrying did not contain alcohol, but Rizer was not convinced. Holding Baltimore's left wrist, he reached for his handcuffs; Baltimore resisted and a struggle ensued. Rizer had Baltimore in a choke hold, and when it appeared that Baltimore would break free, Cpl. Vanstone struck him on the left shoulder with his flashlight. Meanwhile, several men in the crowd, including Saran Baltimore and Eric Green, got involved and went at the officers. During the ensuing melee, Officer Long approached Baltimore from the rear and struck him on the back of the head with his flashlight. The blow brought Baltimore to his knees, and he was handcuffed.

As the crowd was getting out of control, someone called the police. Additional officers quickly arrived on the scene, along with a crew of paramedics. The paramedics treated the injured – in particular, Baltimore, his brother, Saran, Cpl. Rizer, and Cpl. Vanstone. One of the officers who had just arrived took Baltimore to the hospital, where he was diagnosed and treated for a bruised left shoulder and lacerations of the posterior scalp.

B.

On August 30, 2000, a Dougherty County grand jury returned a four-count indictment against Baltimore, Saran Baltimore and Eric Green. Count 1 charged

Saran Baltimore and Green with obstructing Officer Hornsby as he was attempting to maintain crowd control. Count 2 charged all three defendants with obstructing Cpl. Vanstone by striking him with their fists as he was attempting to effect an arrest. Count 3 charged Baltimore with obstructing Cpl. Rizer by striking him with his fist as he was attempting to effect an arrest. Count 4 charged Saran Baltimore and Green with inciting to riot. On August 13, 2001, Baltimore entered an Alford plea[3] to a lesser charge of disorderly conduct, and was sentenced to twelve months probation.[4]

## II.

On July 31, 2002, Baltimore sued Cpl. Rizer, Cpl. Vanstone, Officers Hornsby, Long, and Singleton, the City of Albany and its Chief of Police, in the Superior Court of Dougherty County. His complaint contained seven counts, only one of which is before us – Count I, alleging that the defendants, in subduing him

---

[3] On the standard-form plea that was entered, the offense (disorderly conduct) was written in by hand. Also written in was the qualification that Baltimore was pleading guilty "pursuant to North Carolina v. Alford." In Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), the Supreme Court held that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." Id. at 37, 91 S. Ct. 167. Thus, a court may constitutionally accept a guilty "plea containing a protestation of innocence when . . . [the] defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." Id.

[4] The record does not indicate the disposition of the charges against Saran Baltimore and Eric Green.

5

on the night of June 24, 2000, used excessive force, in violation of the Fourth and Fourteenth Amendments. Baltimore seeks compensatory and punitive damages under 42 U.S.C. § 1983.[5] The defendants timely removed the case to the United States District Court for the Middle District of Georgia, and answered the complaint. In their answers, the individual defendants, referring to Baltimore's claims against them in their individual capacities, raised the defense of qualified immunity. After discovery closed, these defendants moved for summary judgment on the ground of qualified immunity.[6]

The district court concluded that Cpl. Rizer acted properly in stopping Baltimore to determine whether he was violating Albany's open container ordinance, and that Baltimore's conviction for disorderly conduct foreclosed Baltimore's § 1983 claims for false arrest and malicious prosecution.[7] The case boiled down then to whether striking Baltimore on the head with a flashlight constituted excessive force, and whether the officers were entitled to qualified

---

[5] The complaint prayed for such damages against the individual defendants in both their official and individual capacities.

[6] The City of Albany and the individual defendants in their official capacities also moved for summary judgment on the ground that the claims against them were insufficient as a matter of law. The court granted their motions. Those rulings are not before us in this appeal.

[7] Baltimore does not challenge this ruling. His claim, and the one before us, is that the officers used excessive force when they struck him on the head with a flashlight.

6

immunity regarding that act. The court concluded that the striking violated the Constitution, but that the officers – with the exception of Rizer, Singleton, and Long – were entitled to qualified immunity and summary judgment. Rizer, Singleton, and Long, having been denied summary judgment, now appeal. We have jurisdiction to entertain their appeal under 28 U.S.C. § 1291. See Purcell v. Toombs County, Ga., 400 F.3d 1313, 1319 (11th Cir. 2005), accord Jones v. Cannon, 174 F.3d 1271, 1280 (11th Cir. 1999).

## III.

We review a district court's denial of a motion for summary judgment on qualified immunity grounds de novo, applying the same standard as the district court did and construing the facts in the light most favorable to the non-moving party. See Jones, 174 F.3d at 1281; Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co., 111 F.3d 852, 858 (11th Cir. 1997); Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003).

In applying this standard, we find that the district court failed to take into account the special nature of cases where the defense of qualified immunity is asserted. Qualified immunity completely protects government officials sued in their individual capacities as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would

7

have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quoting

Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001)) (additional quotations

omitted). As such, qualified immunity allows officials to "carry out their

discretionary duties without the fear of personal liability or harassing litigation[.]"

Id. at 1194 (citing Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97

L. Ed. 2d 523 (1987)).[8] It is important to note that qualified immunity is

"immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth,

472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985), and therefore

its purposes would be "thwarted if a case is erroneously permitted to go to trial."

Harrell v. Decatur County, Ga., 22 F.3d 1570, 1578 (11th Cir. 1994) (Dubina, J.,

dissenting), vacated by 41 F.3d 1494 (11th Cir. 1995) (adopting Judge Dubina's

dissenting opinion).

Here, the district court ruled that summary judgment could not be granted in

favor of any of the three remaining defendants on the basis of qualified immunity

because "genuine issues of material fact" exist as to whether their conduct violated

Baltimore's constitutional rights. This application of the summary judgment

standard was incorrect because, in qualified immunity cases, a "material issue of

---

[8] There can be no dispute in this case that the officers were acting pursuant to their discretionary authority as Albany police officers when the events at issue occurred. See, e.g., Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004).

fact" never exists. As we recently explained in <u>Robinson v. Arrugueta</u>, 415 F.3d 1252, 1257 (11th Cir. 2005), when the district court considers the record in the light most favorable to the plaintiff, as it must, it necessarily eliminates all issues of fact and proceeds with the "plaintiff's best case before it." "With the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute." <u>Id.</u>

In this case, the district court failed to follow this approach in ruling on the defendants' motion for summary judgment. Instead of eliminating all material fact issues, as it should have, the court searched for disputed facts and, finding them, ruled that summary judgment could not lie. We now rectify this mistake and simply take the evidence, and the facts it establishes, in the light most favorable to Baltimore, and decide whether the officers are entitled to qualified immunity. Before we undertake this task, though, we must say that there is not one whit of proof that Officer Victor Singleton was present at any time during Baltimore's unfortunate encounter with the police. We therefore instruct the district court, on receipt of our mandate, to grant him summary judgment.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

9

seizures." This proscription is incorporated against state and local government officials through the Due Process Clause of the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). The Fourth Amendment also encompasses a person's right to be free from the use of excessive force in the course of an investigatory stop or "seizure" of the person. See Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L. Ed. 2d 443 (1989); Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L. Ed. 2d 1 (1985).

To determine whether the Cpl. Rizer and Officer Long are entitled to immunity, we employ the Supreme Court's two-step inquiry in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). First, considered in the "light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201, 121 S. Ct. at 2156. If, in doing this, we find that no constitutional right was violated, our inquiry ends there and the defendant is entitled to qualified immunity. If the facts disclose a constitutional violation, however, we then must ask whether, at the time the violation occurred, "every objectively reasonable police officer would have realized the acts violated already clearly established federal law." Garrett v. Athens-Clarke Co., 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing Saucier, 533 U.S. at 201-02, 121 S.Ct. at 2151); see also Hope v. Pelzer, 536 U.S. 730, 736, 122

10

S. Ct. 2508, 2513 (2002); <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). In other words, to determine whether the officers' conduct was "reasonable" under the circumstances, we use an objective inquiry: "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to the underlying intent or motivation . . . It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Kesinger v. Herrington</u>, 381 F.3d 1243, 1248 (11th Cir. 2004) (citations omitted).

In this case, both the parties and the district court focused on whether the blow to Baltimore's head with a flashlight constituted deadly or excessive force under the circumstances. Baltimore does not appear to concede that the rest of the officers' conduct on the night in question was not excessive, but even he devotes the bulk of his argument to the force that allegedly put the officer's conduct over the constitutional threshold of <u>Garner</u> and <u>Graham</u>: the surprise, violent blow to the head from a flashlight wielded by Officer Long.

There is no evidence that Cpl. Rizer was the officer who struck Baltimore with the flashlight. Furthermore, Baltimore has not shown that Rizer could have somehow prevented that single blow, which occurred during the fast-moving and chaotic struggle outside Charlie and Diane's Lounge. Baltimore argues that Rizer

11

stood by and failed to prevent Officer Long (a trainee who had been in the field for only a few days) from using excessive and deadly force during the arrest. He contends that "the constitutional right [here, the Fourth Amendment] violated by the passive defendant [Cpl. Rizer] is analytically the same as the right violated by the person who strikes the blows."

We disagree. Even under Baltimore's "best case scenario," the evidence shows that Officer Long delivered a quick, surprise blow when he was not under any control or direction of Cpl. Rizer.[9] As such, there is no evidence that Cpl. Rizer was individually responsible for the excessive force at issue, the blow to the head. The district court therefore erred in denying Cpl. Rizer qualified immunity.[10] See Graham, 490 U.S. at 388, 109 S. Ct. at 1867-88; see also Martin

---

[9] It is undisputed that Officer Long was not the trainee assigned to work with Cpl. Rizer on the night in question. Officer Hornsby was. Instead, Long was paired for patrol with Cpl. Vanstone, and Vanstone's trainee.

[10] To be sure, Cpl. Rizer used some force in subduing Baltimore. That force, however, was neither excessive, nor, viewed objectively, a violation of Baltimore's clearly established constitutional rights. The evidence was that Rizer approached Baltimore and grabbed him by the wrist in an effort to detain him and determine whether the bottle he was holding contained alcohol. Baltimore claims that as he attempted to walk away, Rizer "slapped" the bottle out of his hand, and, as Rizer attempted to take him into custody, an all-out scuffle ensued. During the scuffle, Baltimore contends, Rizer attempted to wrestle him to the ground to put him in handcuffs, struck him on the shoulder with a flashlight (although other officers attribute this act to Cpl. Vanstone), and once he was on the ground put him in a choke-hold. During the melee, which ultimately resulted in verbal and physical assaults against the officers from dozens of bystanders, Rizer was also injured. These facts, even taken in the light most favorable to Baltimore, do not establish (for summary judgment purposes) that Rizer used excessive force in violation of the Constitution. See Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872 ("The calculus

12

v. Anderson, 107 F. Supp. 2d 1342, 1349-50 (M.D. Ala. 1999) (holding that absent evidence that officers on the scene had warning that the arresting officer was going to kick the arrestee in the head, they had no duty to prevent the alleged deadly force).

Whether Officer Long is entitled to qualified immunity presents a much closer question. The Supreme Court reasoned in Brosseau that if an officer has probable cause to believe that a suspect "poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force," and therefore the officer is immune from suit for

_____

of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation"); Brosseau v. Hagen, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); Garrett, 378 F.3d at 1280 ("In analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story"); Crosby v. Monroe County, 394 F.3d 1328, 1334 (11th Cir. 2004) ("We must see the situation through the eyes of an officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal"); Kesinger, 381 F.3d at 1250 ("Before qualified immunity is surrendered by an officer, he or she is entitled to fair and clear warning that the challenged conduct violates federally protected rights").

Moreover, even if Cpl. Rizer had infringed the Fourth Amendment in making the arrest, we nonetheless conclude that he is entitled to qualified immunity under the second prong of the Saucier inquiry. Given the rapidly-evolving and volatile events surrounding Baltimore's stop and arrest, along with the hostile crowd situation that developed, Rizer did not deny Baltimore a clearly established constitutional right. See Garrett, 378 F.3d at 1278-79 (citing Saucier, 533 U.S. at 201-02, 121 S.Ct. at 2151).

13

using deadly force. Brosseau, 543 U.S. at 197-98, 125 S. Ct. at 598 (citations omitted). We have defined "deadly force" as "force that creates 'a substantial risk of causing death or serious bodily injury.'" Harris v. Coweta County, Ga., 406 F.3d 1307, 1314-15 (quoting Pruitt v. City of Montgomery, 771 F.2d 1475, 1479, n. 10 (11th Cir. 1985)), vacated by 433 F.3d 807 (11th Cir. 2005). In Harris, for example, use of a car to ram a suspect's car had the potential of constituting deadly force. See id. at 1315. In contrast, in Garrett we held that tying the arrestee up, "[u]nlike the risk of death from firearms," could not competently be considered a practice likely to cause serious injury or death. See Garrett, 378 F.3d at 1280.

Notably, there is a dearth of case law in this circuit to support the proposition that the use of a flashlight to strike an arrestee over the head necessarily constitutes deadly force. A few cases in this circuit and elsewhere have differed as to whether striking a suspect over the head with a blunt object could per se cause death or serious injury, or whether it even constitutes excessive force. See, e.g., Garrett, 378 F.3d at 1277-78 (hitting suspect once on the top of the head with the butt of a gun, combined with forcibly apprehending him and tying him up, not considered excessive force under the circumstances); Hygh v. Jacobs, 961 F.2d 359, 362, 364-65 (2nd Cir. 1992) (expert testimony that blow to

14

the face with baton or flashlight constituted "deadly physical force"; court holds that "the evidence that [the officer] did in fact use excessive force against [the plaintiff] was strong");[11] Evans v. City of Neptune Beach, 61 F. Supp. 2d 1245, 1252 (M.D. Fla. 1999), aff'd, 213 F.3d 647 (11th Cir. 2000) (reasoning that blow from baton to certain areas of the body is not generally likely to be lethal, but "a blow to the head or neck could very easily cause serious injury or death"); Hodsdon v. Town of Greenville, 52 F. Supp. 2d 117, 124 (D. Me. 1999) (reasoning that "gratuitous blow to the head with a blunt instrument would clearly constitute excessive force").  Nonetheless, in the cases that have specifically addressed the issue, there appears to be agreement that striking a suspect in the head with a heavy flashlight or other blunt instrument at least poses a "substantial risk of serious bodily injury," if not death.  We adopt this conclusion and find that such action constitutes deadly force under our definition of that term.

Viewing the record in the light most favorable to Baltimore, we conclude that it was not objectively reasonable for Officer Long to strike Baltimore on the head with a heavy flashlight, apparently knocking him to the ground and causing a

---

[11] At oral argument, counsel for the officers correctly pointed out that in Hygh, the Second Circuit did not hold that the use of a flashlight to subdue an arrestee per se constituted deadly force.  Instead, that subject was broached through expert testimony which was held inadmissible.  The Second Circuit did reason, however, that there was "strong evidence" of excessive force when the arrestee was unexpectedly struck in the face by the officer.  This is similar to the unexpected blow to Baltimore's head in this case.

serious wound. Certainly, the events were hectic, volatile and evolving at a rapid pace, but Long's decision to use this amount of force in subduing the arrestee amounted to excessive force in the constitutional sense. In sum, Long is not entitled to qualified immunity under the first prong of Saucier.

The next inquiry under Saucier is whether, at the moment Long acted, "every objectively reasonable police officer would have realized the act[] violated already clearly established federal law." See Garrett, 378 F.3d at 1278-79 (citing Saucier, 533 U.S. at 201-02, 121 S.Ct. at 2151) (emphasis added); see also Hope, 536 U.S. at 736, 122 S. Ct. at 2513; Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003). Due to the fast-paced, violent and escalating events surrounding Baltimore's arrest and the ominous threat posed by the crowd of bystanders, combined with the lack of black-letter guidance within this circuit concerning what Officer Long was about to do, it is certainly difficult to conclude that he acted contrary to what every other objectively reasonable officer would have done to diffuse the situation and effectuate Baltimore's arrest.

Nonetheless, the district court concluded that "[c]onsidering that the arrest of Baltimore was based on the allegation that Plaintiff had violated a municipal ordinance and the incident escalated when Plaintiff tried to resist, the use of deadly force was unnecessary" under the "clearly established law" of Garner. We

16

agree and find that Officer Long is not entitled to qualified immunity. Although

Garner and Graham are themselves too general to provide the "clearly established

law" that would have given Officer Long "fair warning" that his conduct would

violate Baltimore's constitutional rights, see Brosseau, 543 U.S. at 198, 125 S. Ct.

at 599; Pace v. Capobianco, 283 F.3d 1275, 1283 (11th Cir. 2002), we find that

this case is "obvious" enough for the standards set forth in Garner and Graham to

provide the necessary "particularized" guidance for reasonable officers. See

Hope, 536 U.S. at 738, 122 S. Ct. at 2508; Brosseau, 543 U.S. at 198, 125 S. Ct. at

599; Pace, 283 F.3d at 1283; see also Mathis v. Parks, 741 F. Supp. 567, 572

(E.D.N.C. 1990) ("[T]he potential applicability of Garner's fourth amendment

analysis would be apparent, since a reasonable officer would be aware that a full-

force blow delivered to the abdomen using the knee as a blunt instrument could

constitute deadly force").

Even under the chaotic circumstances of the moment, the fact remains that

four officers were engaged in arresting Baltimore for violating a city ordinance.

Although a hostile crowd tried to abort the arrest, there is no indication that

Baltimore was going to escape the grasp of the officers. Reasonable officers in

Long's situation would not have violently struck a misdemeanor suspect, who was

being subdued by several officers, in the head with a blunt object to effectuate an

17

arrest for violating the city's open container ordinance.

This is a case where a "general constitutional rule already identified in the decisional law . . . appl[ied] with obvious clarity" to Long's conduct, as use of force that could cause death or serious harm to effectuate a misdemeanor arrest was excessive under these circumstances. See United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997); Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987); Vaughan, 343 F.3d at 1332, quoting Hope, 536 U.S. at 741, 122 S. Ct. at 2516 ("the Supreme Court in Hope cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration. The 'salient question' . . . is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional"). Officer Long is therefore not entitled to qualified immunity.

IV.

For the foregoing reasons, we conclude that Cpl. Rizer and Officer Singleton are entitled to judgment. Officer Long is not. The district court's summary judgment is therefore affirmed, in part, reversed, in part.

SO ORDERED.

18

EDMONDSON, Chief Judge, Concurring in the Result in Part and Dissenting in Part:

I concur in the result except for Officer Long.  In my judgment, Officer Long is also entitled to immunity.  The preexisting law did not clearly establish what Officer Long did was a violation of federal law.