Derrick T. **CALHOUN**, Plaintiff,

v.

Russell **THOMAS** and Frank **Wheeler**, Defendants.

Civil Action No. 2:02cv1157–T.

United States District Court, M.D. Alabama, Northern Division.

March 11, 2005.

Derrick T. Calhoun, Brent, AL, pro se.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Derrick T. Calhoun, an inmate in the custody of the Alabama Department of Corrections, brings this *pro se* lawsuit against defendants Pike County Sheriff Russell Thomas and Deputy Sheriff/Investigator Frank Wheeler under 42 U.S.C.A. § 1983.[1] Calhoun claims that Sheriff Thomas and Deputy Wheeler violated his constitutional rights in three ways upon his arrest and during his subsequent confinement in the Pike County Jail: by using excessive force, by failing to provide him with adequate medical care, and by subjecting him to unconstitutional conditions of confinement. At this stage in the lawsuit, claims remain against Thomas and Wheeler in their individual capacities only.[2] Jurisdiction is proper under 28 U.S.C.A. §§ 1331 (federal question) and 1343(a)(4) (civil rights).

This case is currently before the court on Thomas and Wheeler's supplemental motion for summary judgment.[3] For the following reasons, the motion will be denied in part and granted in part.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993)

---

1. Calhoun's complaint also named a Pike County Commissioner, Edge Regional Medical Center, and Doctors Darrell J. Potter and Elray Jenking as additional defendants. Upon recommendation of the magistrate judge, this court dismissed the claims against the County Commissioner, the Medical Center, and the two doctors in an order dated December 13, 2002 (Doc. No. 12).

2. Calhoun initially sued Thomas and Wheeler in their official capacities as well. However, in an opinion and companion order dated April 21, 2004 (Doc. Nos. 37 & 39), this court granted partial summary judgment in their favor to the extent they had been sued in their official capacities.

3. Thomas and Wheeler first submitted a special written report in response to the com-

plaint, as ordered by the magistrate judge (Doc. No. 16). The magistrate judge then deemed it appropriate to treat the report as a motion for summary judgment, and proceeded to recommend the denial of said motion (Doc. No. 34). This court upheld the magistrate judge's recommendation that Calhoun's claims against Thomas and Wheeler in their individual capacities should be denied (Doc. No. 37). Thomas and Wheeler then filed a motion for leave to file a supplemental motion for summary judgment (Doc. No. 78) arguing that since the filing of their first special report, they had had the opportunity to depose witnesses and acquire additional evidence they claimed would be dispositive of the outstanding issues in the case. The court granted their motion (Doc. No. 85) and this supplemental motion for summary judgment followed.

(discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. Fed.R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although *pro se* complaints are entitled to liberal interpretation by courts, a *pro se* litigant does not escape the burden of establishing a genuine issue of material fact. *Brown v. Crawford,* 906 F.2d 667, 670 (11th Cir.1990).

## II. FACTUAL BACKGROUND

What follows is a preliminary summary of Calhoun's version of the facts in this case. Because Calhoun's arguments are relatively discrete, his specific factual allegations will be discussed in more detail in the discussion section for each of his claims.

On October 17, 2001, a robbery and shooting occurred at Huk–A–Buk Barbeque near Troy, Alabama.[4] In the early evening of October 19 at around 6:00 p.m., two law enforcement officers (not Sheriff Thomas and Deputy Wheeler) came to Calhoun's grandmother's house in search of Calhoun, whom Thomas and Wheeler had spoken to earlier that day about the robbery and had released.[5] After locating Calhoun, the officers informed him that Sheriff Thomas wanted him to come in to the station for further questioning. Though Calhoun was initially reluctant, he agreed to go to the station after it appeared to him that, if necessary, the officers would force him to go.[6] Once Calhoun arrived at the station, Sheriff Thomas and Deputy Wheeler took him into an interrogation room and told him they wanted him to make a statement about his activities on the night of October 17. Calhoun stated that he wished to remain silent.[7]

Nevertheless, over the course of the next several hours, Calhoun signed a waiver of his rights and made three separate statements to Thomas and Wheeler regarding his involvement in the Huk–a–Buk robbery and shooting.[8] He ultimately confessed to being involved in the robbery and to shooting the victim.[9] Calhoun states that he made these statements under duress after Thomas and Wheeler had physically attacked and abused him.[10] In addition, Calhoun sustained a gunshot wound

4. Defendants' written report (Doc. No. 16), Pike County Sheriff's Office Press Releases, Ex. 1. According to the October 23, 2001, press release, two armed suspects wearing masks robbed the restaurant on October 17 at 7:45 p.m. During the course of the robbery, one of the men fired several shots from an SKS assault rifle and fatally wounded the owner of the business.

5. Complaint (Doc. No. 1), p. 3.

6. Plaintiff's affidavit in response to defendant's report (Doc. No. 25), p. 3.

7. *Id.* at 4.

8. Evidentiary submission in support of defendants' supplemental motion for summary judgment (Doc. No. 84), Exs. 1 & 3.

9. *Id.*, Ex. 3, at 3–4.

10. Plaintiff's affidavit (Doc. No. 25), p. 10.

to his left arm during the course of the robbery, and was in pain. He contends that during questioning, he repeatedly asked Thomas and Wheeler to take him to the hospital for medical care but they refused.[11]

Calhoun was finally taken to the emergency room at Edge Regional Medical Center in Troy, Alabama, at approximately 12:30 a.m.[12] The emergency room physician on duty examined Calhoun's wound, prescribed him an antibiotic, and released him.[13] Calhoun was then booked into the Pike County Jail at approximately 2:05 a.m. on October 20, 2001.[14]

Calhoun states that, over the course of the next several months, he remained in constant pain from the gunshot wound in his left forearm and was continually denied pain medication by Sheriff Thomas and Deputy Wheeler despite numerous requests.[15] In addition, Calhoun alleges that they prevented him from receiving adequate medical care for his arm while incarcerated in the Pike County Jail.[16] He states that he did not receive relief from his pain until December 31, 2001, when he ultimately underwent an operation to repair brachial arterial injury to his left arm caused by the bullet.[17]

Finally, Calhoun claims that he was subjected to unsanitary, overcrowded, and otherwise unsafe conditions during the first few months of his stay in the Pike County Jail.

## III. DISCUSSION

### A. Excessive Force

According to Calhoun, he willingly accompanied the two law enforcement officers down to the station when they came to his grandmother's home on October 19, 2001. He states that his cousin, Dale Corgborn, also came with him to the station.[18] Upon arriving at the Pike County Sheriff's Department, Sheriff Thomas and Deputy Wheeler took Calhoun into an interrogation room and closed the door. Corgborn was not allowed in the room and was asked to wait outside.[19] Calhoun contends that, after they had him alone, Thomas and Wheeler placed him in tight handcuffs and legcuffs, and told him that they were going to keep him miserable until he made a statement about the Huk–A–Buk Barbeque robbery and shooting.[20]

Calhoun states that when he informed them that he did not wish to make a statement about his activities on October 17, Thomas and Wheeler began hitting him and threw him into a door several times.[21] He claims that they not only refused to provide him with medical treatment for his arm until he made a statement regarding his involvement in the robbery and shooting, but that they deliberately and repeatedly punched him in the wounded area of his arm, telling him that they wanted him to suffer like the victim, who was apparently a friend of Sheriff Thomas, had suffered.[22]

11. *Id.* at 8–9.

12. Evidentiary submission (Doc. No. 84), Edge Regional Medical Center Summary Sheet, Ex. 29.

13. Defendants' brief in support of supplemental motion for summary judgment (Doc. No. 78), p. 5.

14. *Id.*

15. Complaint (Doc. No. 1), p. 5.

16. Plaintiff's affidavit (Doc. No. 25), p. 19–23.

17. Evidentiary submission (Doc. No. 84), Operative Report, Ex. 34.

18. Plaintiff's affidavit (Doc. No. 25), p. 3.

19. *Id.* at 4.

20. *Id.* at 5.

21. *Id.*

22. *Id.* at 7.

Over the course of the next several hours, Calhoun made three separate statements about his activities on October 17, 2001. He was asked to sign a waiver of rights statement before making at least two of the three statements.[23] After Calhoun confessed to his involvement in the robbery and shooting in his third and final statement, Sheriff Thomas and Deputy Wheeler formally arrested him and asked him to sign a consent-to-search form for his residence and vehicle.[24] They then took photographs of his wounded arm, placed him in a police vehicle, drove back to his grandmother's home and searched the residence while he remained in the car. Finally, after retrieving several items from the home, they took him to the emergency room of Edge Regional Medical Center in Troy, Alabama.[25]

Sheriff Thomas and Deputy Wheeler sharply contest Calhoun's allegation that they used excessive force against him during questioning. They contend that there is conclusive evidence indicating that any force they used was de minimus and that, therefore, they did not engage in conduct that rises to the level of a violation of Calhoun's constitutional rights.[26] To the extent that they admit to using force at all, Thomas and Wheeler argue that they are entitled to qualified immunity.

For the reasons that follow, summary judgment will be denied as to this excessive-force claim. The court will first discuss the constitutional basis for Calhoun's claim, which raises some rather unsettled legal issues, and will then turn to the defense of qualified immunity.

### i. Constitutional basis for excessive-force claim

█ The first line of inquiry in analyzing a § 1983 excessive-force claim is to identify the specific constitutional right allegedly infringed by the challenged application of force. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The Fourth Amendment prohibition against unreasonable seizures of the person, the Fourteenth Amendment due process clause, and the Eighth Amendment ban on cruel and unusual punishment all protect an individual's personal security; the plaintiff's status as a person undergoing seizure, a pretrial detainee, or a convicted person determines which constitutional protection he is afforded.

█ It is well-settled that the Eighth Amendment Cruel and Unusual Punishment Clause "was designed to protect those convicted of crimes," and consequently the clause applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986) (internal quotations and citations omitted) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40, 97 S.Ct. 1401, 1412, n. 40, 51 L.Ed.2d 711 (1977)). Thus, persons like Calhoun, who allege they were subjected to excessive force *prior* to a criminal conviction, are protected by either the Fourth or Fourteenth Amendments.

█ Until 1989, when the Supreme Court decided *Graham*, the majority of

---

23. Evidentiary submission (Doc. No. 84), Pike County Sheriff's Department Waiver of Rights Form, Ex. 1–3. Thomas and Wheeler contend in their brief that Calhoun signed a waiver of rights statement before each of his three statements. However, the evidentiary submission provided by them contains copies of only Calhoun's first and third waiver-of-rights statements.

24. Defendants' brief (Doc. No. 78), p. 4.

25. *Id.* at 4.

26. *Id.* at 13.

federal courts indiscriminately applied a four-part "substantive due process" test to all excessive-force claims brought against law enforcement and prison officials under § 1983. *Graham*, 490 U.S. at 393, 109 S.Ct. at 1870.[27] In *Graham*, the Supreme Court clarified that all excessive-force claims are not to be governed by a single standard. Rather, a court must apply the constitutional standard governing the specific right allegedly infringed. The Court noted that the standards used to evaluate excessive-force claims under the Fourth and Fourteenth Amendments differ, further specifying:

> "*All* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."

*Id.* at 395, 109 S.Ct. at 1871 (emphasis in original). The Court went on to state that the Fourteenth Amendment Due Process Clause protects pretrial detainees from the use of excessive force that amounts to punishment. It failed, however, to identify the particular point at which the process of arrest ends and pretrial detention begins, and thus left unanswered the question of which amendment applies to allegations of excessive force occurring after the physical act of the arrest itself, but prior to the official commencement of pre-trial detention.

For this reason, the issue of whether Calhoun's excessive-force claim should be analyzed under the Fourth or Fourteenth Amendment is somewhat vexing. There is no question that although Calhoun had not yet been formally arrested at the time Sheriff Thomas and Deputy Wheeler allegedly handcuffed, choked, and beat him,[28] he had already been "seized" for Fourth Amendment purposes. *California v. Hodari D.*, 499 U.S. 621, 625, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991) (recognizing that a quintessential "seizure of a person" for Fourth Amendment purposes requires the mere grasping or application of physical force, whether or not it succeeds in subduing the arrestee); *see also Terry v. Ohio* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968) (a Fourth Amendment "seizure" occurs when government actors have, "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen"). After Calhoun arrived at the station, Thomas and Wheeler placed him in an interrogation room and handcuffed and legcuffed him. Their actions most certainly implied that he was not free to leave. Furthermore, Calhoun had been placed under "custodial interrogation" such that he had the right to receive *Miranda* warnings, as evidenced by the fact that Thomas and Wheeler required him to sign at least two separate *Miranda* waivers before making his incriminating statements.[29]

Nevertheless, while it is clear that Calhoun had already been "seized" and, for all

---

**27.** This test, first pronounced by the Second Circuit in *Johnson v. Glick*, 481 F.2d 1028, *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), requires consideration of the following factors: (1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; (3) the extent of the injury inflicted; and (4) "[w]hether the force was applied in a good faith effort to maintain and restore discipline or maliciously or sadistically for the very purpose of causing harm."

**28.** *See* defendant's brief (Doc. No. 78), p. 4 ("After providing the statement contained in defendants' Exhibit 3, Calhoun was arrested for his involvement in the robbery and shooting ...").

**29.** Evidentiary submission (Doc. No. 84), Pike County Sheriff's Department Waiver of Rights Form, Ex. 1–3.

intents and purposes, arrested at the time of the alleged abuses, it is equally plain that he had not yet acquired the status of a pretrial detainee. As a formal matter, Calhoun had not yet been officially arrested at the time the alleged abuses occurred. In addition, he was in the custody of the officers who eventually arrested him at all times during the interrogation process. He had not been booked into the Pike County Jail, and had not yet made an initial appearance before a judge.[30] Furthermore, at that point in time, Calhoun had not been charged with any crime. Thus, the alleged application of excessive force in this case occurred while Calhoun was in a 'legal twilight zone,' the legal implications of which were left unclear by *Graham.*

Since *Graham* was decided, lower courts have grappled with the issue of which constitutional provision provides protection from excessive force during this period of detention following an arrest or seizure, but prior to a judicial determination of probable cause.[31] While some federal appellate courts have continued to apply the Fourteenth Amendment Due Process Clause to excessive force claims occurring during this post-arrest, pre-custody time period, a number of appellate courts have applied the Fourth Amendment to incidents of excessive force occurring after the moment of arrest by adopting the 'continuing seizure' approach to defining when seizure ends and pretrial detention begins. Under this analysis, a Fourth Amendment seizure is treated as extending beyond the actual moment of arrest to the ensuing period of intermittent custody in the hands of the arresting officers. *See, e.g., Fontana v. Haskin,* 262 F.3d 871, 879–880 n. 5 (9th Cir.2001) ("The Fourth Amendment's prohibition against unreasonable search and seizure continues to apply after an arrestee is in the custody of the arresting officers"); *Torres v. McLaughlin,* 163 F.3d 169, 174 (3d Cir.1998), *cert. denied,* 528 U.S. 1079, 120 S.Ct. 797, 145 L.Ed.2d 672 (2000); *Cox v. Treadway,* 75 F.3d 230, 235 (6th Cir.), *cert. denied,* 519 U.S. 821, 117 S.Ct. 78, 136 L.Ed.2d 37 (1996); *Austin v. Hamilton,* 945 F.2d 1155 (10th Cir.1991) (overruled on other grounds) (applying Fourth Amendment standard to excessive force claim where plaintiffs were detained and beaten for 12 hours without being formally arrested); *Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir.1989) ("We think the Fourth Amendment should probably be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer").

The Eleventh Circuit Court of Appeals has not explicitly adopted this 'continuing seizure' test. However, it has indirectly countenanced the application of the Fourth Amendment to post-arrest, pre-detention excessive-force claims in several cases. In *United States v. Myers,* 972 F.2d 1566, 1571–72 (11th Cir.1992), *cert denied,* 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993), the court upheld a Fourth Amendment jury instruction for a post-arrest, pre-charge excessive-force claim brought under 18 U.S.C.A. § 242.[32] Although

---

**30.** *Id.,* Pike County Jail Admission Records, Exs. 23 and 24.

**31.** *See generally* Erica Haber, Note, *Demystifying a Legal Twilight Zone: Resolving the Circuit Court Split on When Seizure Ends and Pretrial Detention Begins in § 1983 Excessive Force Cases,* 19 N.Y.L.Sch.J.Hum.Rts. 939 (2003).

**32.** 18 U.S.C.A. § 242 is essentially a criminal counterpart to 42 U.S.C.A. § 1983. It reads, in relevant part:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or

*Myers* was a criminal case, it implicates the same concepts as a civil case.[33]

In *Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir.1996), the court again acknowledged the application of the Fourth Amendment to such excessive-force claims. The case involved an arrestee who died from positional asphyxia while being transported in the back of a police car after his arrest. The administrator of his estate brought a § 1983 action against members of the Montgomery Police Department, including a mistreatment-in-custody claim under the Fourteenth Amendment and a Fourth Amendment excessive-force claim. In reversing the district court's denial of summary judgment on both claims, the appellate court did not specifically address whether the Fourth Amendment 'reasonableness' test was the appropriate standard for all post-arrest, pre-detention excessive-force claims. However, by analyzing and rejecting the plaintiff's excessive-force claim without further commenting on the relevant standard, it at least implicitly acknowledged that the Fourth Amendment provided the appropriate constitutional framework in that particular post-arrest case.

Most recently, the Eleventh Circuit touched upon the issue in *Garrett v. Athens–Clarke County*, 378 F.3d 1274 (11th Cir.2004), another § 1983 excessive-force case alleging a Fourth Amendment violation of an arrestee's rights. As in *Cottrell,*

the arrestee in *Garrett* died from positional asphyxia. In this case, arresting officers had pepper-sprayed him and bound his feet and ankles together during the course of arresting him. He died while lying in the road behind the squad car, moments after he had been physically subdued. In noting that Garrett's claim was properly analyzed under the rubric of the Fourth Amendment, the court stated in a footnote,

"Although the line is not always clear as to when an arrest ends and pretrial detention begins, the facts here fall on the arrest end. *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir.1998) (stating Fourteenth Amendment analysis does not begin until '*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time') (quotation and citation omitted)."

*Garrett,* 378 F.3d at 1279 n. 11. By citing to a Fifth Circuit Court of Appeals case that emphasized the specific limits of the Fourteenth Amendment in excessive-force cases, the court again implied that the Fourth Amendment provides a more appropriate framework of analysis for post-arrest, pre-detention cases.

Finally, in *Albritten v. Dougherty County,* 973 F.Supp. 1455 (M.D.Ga.1997)

protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race than are prescribed for the punished of citizens, shall be fined ... or imprisoned...."

**33.** Nevertheless, this case cannot be taken to stand for the general proposition that the Eleventh Circuit categorically applies the Fourth Amendment in such cases. After upholding the jury instruction, the court went on to caution:

"Although we uphold the instruction given, we wish to make it explicit that we are not deciding that the Fourteenth Amendment's 'shocking to the conscience' standard does not apply in evaluating the use of excessive force by the police in post-arrest, precharge cases. That issue is not before us. We hold only that it was not plain error for the district court to give the instruction it did."

*Myers,* 972 F.2d at 1572.

(Sands, J.), the district court held that the Fourth Amendment applied to an excessive-force claim brought by an arrestee who alleged that he was stripped, beaten, kicked, and choked in a county jail shortly after he was arrested and transported to the jail for driving under the influence. In so holding, the court relied on the holdings of other circuits as well as the fact that "the Supreme Court has consistently recognized the particular applicability of the Fourth Amendment to police conduct in the course of a citizen's arrest and incarceration prior to an initial judicial hearing." *Albritten,* 973 F.Supp. at 1463. *See also, Sweatt v. Bailey,* 876 F.Supp. 1571, 1581–83 (M.D.Ala.1995) (Thompson, J.) (discussing the Supreme Court's expansion of the scope of the Fourth Amendment in the context of a § 1983 excessive-force case).

Indeed, a plurality of the Supreme Court expressed an expansive interpretation of the scope of the Fourth Amendment in *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion), a case involving the right to be free from criminal prosecution except with probable cause. In *Albright,* the plurality rejected a substantive due process claim under the Fourteenth Amendment because the Fourth Amendment addressed "the matter of pretrial deprivations of liberty." *Albright,* 510 U.S. at 274, 114 S.Ct. at 813. Justice Ginsburg further expressed support for the concept of a 'continuing seizure' in her concurrence, noting that at common law, seizure continued even after an arrestee was released from custody. *Id.* at 277–78, 114 S.Ct. at 815.

Thus, the Eleventh Circuit's own case law, in addition to the case law of a number of other circuits and the Supreme Court, suggests that an analysis under the Fourth Amendment is appropriate, if not required, in post-seizure, pre-detention allegations of excessive force such as Calhoun's. Accordingly, this court finds that the Fourth Amendment is the specific constitutional right allegedly infringed by the challenged application of force in this case.[34] Although Calhoun did not specifically allege a Fourth Amendment violation in his complaint, the court further finds that the factual allegations of the complaint, when combined with Calhoun's general claim that Sheriff Thomas and Deputy Wheeler violated his constitutional rights by subjecting him to excessive force, sufficiently satisfy the notice pleading requirements of the Federal Rules of Civil Procedure such that the court may consider the Fourth Amendment as a potential basis for his excessive-force claim. *Albritten,* 973 F.Supp. at 1458. This conclusion is especially justified given that *pro se* filings are entitled to liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

34. Up until this point in the case, Calhoun's excessive-force claim has been improperly analyzed under both the Eighth and Fourteenth Amendments. In its report and recommendation of denial of Thomas and Wheeler's first motion for summary judgment, the magistrate judge mistakenly stated that Calhoun was arrested prior to arriving at the Pike County Sheriff's Department. Recommendation of the magistrate judge (Doc. No. 34), p. 2. The magistrate judge went on to analyze the claim under the Fourteenth Amendment, and recommended that Thomas and Wheeler's motion for summary judgment be denied.

This court then partially adopted the magistrate judge's findings without comment as to whether he had employed the appropriate constitutional framework in his analysis of the excessive-force claim. Order regarding recommendation of the magistrate judge (Doc. No. 37).

Furthermore, in their brief in support of their supplemental motion for summary judgment (Doc. No. 78), Thomas and Wheeler incorrectly base their argument for summary judgment on an Eighth Amendment analysis of the claim.

Having established that Calhoun's excessive-force claim is most properly examined under the rubric of the Fourth Amendment, the court now turns to the substance of his claim. Because Thomas and Wheeler are attempting to invoked qualified immunity with respect to this claim, the court will discuss the substantive violations alleged within the context of that defense.

### ii. Qualified immunity

The doctrine of qualified immunity insulates government agents from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Greason v. Kemp,* 891 F.2d 829, 833 (11th Cir.1990). As established by the Supreme Court in *Harlow,* the test for qualified immunity hinges on whether the officials' conduct was objectively reasonable in light of established law. Government officials are shielded from liability for civil damages unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

In order to be entitled to qualified immunity, a public official defendant must first prove that he was acting within the scope of his discretionary authority at the time of the allegedly unconstitutional conduct. *Lee v. Ferraro,* 284 F.3d 1188 1192 (11th Cir.2002). Once this has been established, the court must undertake the two-pronged inquiry outlined in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under the *Saucier* framework, the court must first determine whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right. If so, the next inquiry becomes whether that right was clearly established in light of the specific context of the case. *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. *See also Brosseau v. Haugen,* —— U.S. ——, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

#### a. Scope of discretionary authority

■■ To show that he acted within the scope of discretionary authority, a defendant must demonstrate that when the alleged actions took place, he was performing his employment duties and was within the scope of his authority. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). In this case, Sheriff Thomas and Deputy Wheeler were interrogating Calhoun during the time of the alleged application of force. Because interrogating suspects and witnesses is one of a law enforcement officer's basic duties, the court finds that Thomas and Wheeler were acting within the scope of their discretionary authority for qualified immunity purposes, and now turns to the more pivotal aspects of the qualified immunity inquiry; that is, whether Calhoun has adequately alleged violation of a constitutional right, and whether that right was clearly established at the time of the incident.

#### b. Violation of a constitutional right

■ In analyzing whether Calhoun's Fourth Amendment right to be free from unreasonable seizures was violated, the court must determine whether Thomas and Wheeler's actions were "objectively reasonable" in light of the totality of the circumstances confronting them, without regard to their underlying intent or motivation. *Graham,* 490 U.S. at 396, 109 S.Ct at 1871–72. The officers' acts should be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* This reasonableness calculus must allow for the fact that law enforcement officers "must often make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* In analyzing Fourth Amendment excessive-force claims, the court looks to the circumstances under which the force was applied, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Garrett,* 378 F.3d at 1279 (quoting *Lee,* 284 F.3d at 1197–98 (11th Cir.2002)).

As the preceding quote suggests, a certain amount of force is sometimes justified in a heat-of-the-moment arrest. However, courts have held that any amount of force used during an interrogation when the suspect poses no threat may violate a person's constitutional rights. As the Fifth Circuit stated,

"[I]n the context of custodial interrogation, the use of nearly any amount of force may result in a constitutional violation when a suspect 'poses no threat to the officers' safety or that of others, and the suspect does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use of force is justified."

*Ikerd v. Blair,* 101 F.3d 430, 434 (5th Cir.1996) (citations and internal quotations omitted) (quoting *Ware v. Reed,* 709 F.2d 345, 351 (5th Cir.1983)).

■ At the time Calhoun alleges he was subjected to force, Thomas and Wheeler had already taken him into their physical custody. He was seated in an interrogation room at the sheriff's department and was being questioned about a crime. He posed no threat to Thomas and Wheeler's safety or to the safety of others. There is no evidence, nor do Thomas and Wheeler, that Calhoun was attempting to resist arrest or trying to escape from the room. Rather, if Calhoun is to be believed, the force used by Thomas and Wheeler was completely unprovoked. According to him, Thomas and Wheeler choked and beat him, punched him in his gunshot wound, and slammed him into a door several times not for the purpose of subduing him or protecting themselves, but to force him to make a statement, and, as they explicitly told him, to make him suffer as the victim in the robbery and shooting had suffered. There is nothing even perceptibly reasonable about such behavior, if it in fact occurred. Thus, the court easily concludes that the alleged conduct rises to the level of a violation of Calhoun's constitutional rights.

### c. Clearly established law

Having determined that Calhoun has alleged a deprivation of a constitutional right, further inquiry is now needed to determine whether that right was clearly established at the time of the alleged violation. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

Qualified immunity shields officers from suit "when they make decisions that, even if constitutionally deficient, reasonably misapprehend the law governing the circumstances they confronted." *Brosseau v. Haugen,* —— U.S. ——, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004). Because the qualified immunity inquiry focuses on whether the officers had fair notice of the unlawfulness of their conduct, the court must examine the officers' reasonableness at the time of the alleged conduct. Only if the law at that time clearly established that the alleged conduct violated the Constitution are the officers liable for their conduct. *Id.*

In making this determination, "the relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156. The Supreme Court

recently emphasized that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, —— U.S. at ——, 125 S.Ct. at 599 (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2151). The court must therefore inquire whether, at the time of Sheriff Thomas and Deputy Wheeler's alleged actions, it was "clearly established" in the more "particularized" sense that they were violating Calhoun's rights. *Id.* However, the Court has made it equally clear that in an "obvious case," a constitutional violation can be "clearly established" even "without a body of relevant case law." *Id.* at ——, 125 S.Ct. at 599.

In *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002), the Supreme Court reversed an Eleventh Circuit decision shielding Alabama prison guards from liability for handcuffing an inmate to a hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. In its opinion, the Eleventh Circuit had held that although the use of the hitching post for punitive purposes violated the inmate's Eighth Amendment rights, the officers were entitled to qualified immunity. The appellate court reasoned that the violation was not "clearly established" because the Eleventh Circuit had not previously decided a case with facts that were "materially similar" to those presented by *Hope*.

 The Supreme Court disagreed with the Eleventh Circuit and reversed, holding that the appropriate qualified-immunity inquiry is whether relevant case law "gave reasonable warning that the conduct then at issue violated constitutional rights," regardless of whether the facts of prior cases are "materially similar." In so holding, the Court emphasized that general statements of law can be sufficiently clear to place officers on notice that their conduct is unconstitutional. Therefore, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." 536 U.S. at 741, 122 S.Ct. at 2516 (quoting *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) (citations and internal quotations omitted)).

Applying this standard to the facts in *Hope*, the Court held that its own case law, in addition to binding Eleventh Circuit precedent, an Alabama Department of Corrections regulation (ADOC), and a Department of Justice report informing the ADOC of the unconstitutionality of the use of the hitching post was sufficient to provide the defendants in that case with notice that their conduct was unlawful. The Court went on to further note that "the obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment." *Hope*, 536 U.S. at 745, 122 S.Ct. at 2518. Thus, the officers had "fair and clear warning" of the unconstitutionality of their conduct such that they were not entitled to qualified immunity. *Id.* at 746, 122 S.Ct. at 2518.

 The facts in this case provide an even stronger basis for denying qualified immunity to Thomas and Wheeler than *Hope* itself. *Hope* presented the Court with a set of facts that had never previously arisen in the case law. Thus, the Court had to decide whether previous, factually distinguishable cases placed the defendants on sufficient notice that their conduct was unlawful. In contrast, there is an abundance of Eleventh Circuit case law suggesting that Thomas and Wheeler should have been on notice that "the obvious cruelty," *Hope*, 536 U.S. at 745, 122 S.Ct. at 2518, in their alleged conduct

transgressed obvious constitutional boundaries.

As previously discussed, Calhoun alleges that he was abused by Thomas and Wheeler while they interrogated him about his involvement in a robbery and shooting. According to Calhoun, he was seated in the interrogation room, and was handcuffed and legcuffed, when they choked and beat him and slammed him into a door. Thus, at the time the alleged force occurred, Calhoun was fully restrained, did not present a danger, and was not a flight risk.

The Eleventh Circuit has denied qualified immunity to defendant officers numerous times where, as in Calhoun's case, an arrestee has been restrained and does not resist, attempt to flee, or struggle with officers. The appellate court has held that in such cases, any reasonable officer would know that the use of force is no longer necessary to further any legitimate law enforcement purpose. *See, e.g., Lee v. Ferraro,* 284 F.3d 1188, 1199 (11th Cir. 2002) (defendant officer not entitled to qualified immunity because "no reasonable officer" could have believed that he had the lawful authority to slam woman's head against her trunk after she had been pulled over, arrested, secured with handcuffs, posed no danger to the arresting officer, and did not present a flight risk); *Slicker v. Jackson,* 215 F.3d 1225 (11th Cir.2000) (officers not entitled to qualified immunity where they slammed plaintiff's head against the pavement after he was arrested for disorderly conduct and "he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way"); *Priester v. City of Riviera Beach,* 208 F.3d 919 (11th Cir.2000) (defendant officer not entitled to qualified immunity because "no reasonable police officer" could believe that releasing attack dog on plaintiff who was lying on the ground, was not attempting to flee or resist arrest, and who "did not pose a threat of bodily harm

to the officers or to anyone else" was permissible use of force); *Smith v. Mattox,* 127 F.3d 1416 (11th Cir.1997) (officer not entitled to qualified immunity on summary judgment where he deliberately broke subdued suspect's arm in the process of handcuffing him; assuming that plaintiff "was offering no resistance *at all,*" the broken arm "was obviously unnecessary to restrain even a previously fractious arrestee"). Furthermore, as noted above, the Fifth Circuit has specifically held that any use of force during interrogation when the suspects posed no threat of any kind may be unconstitutional. *Ikerd,* 101 F.3d at 434.

Thus, even more so than in *Hope,* it does not take hindsight or tortured reasoning to arrive at the conclusion that relevant case law indicates that the use of force in this case was clearly established to be unconstitutional at the time the events allegedly occurred. Thomas and Wheeler's conduct in this case is not comparable to a split-second decision where an officer is physically threatened. They had Calhoun alone in an interrogation room, handcuffed and legcuffed, when they allegedly maliciously assaulted him not to restrain or subdue him, but for the very purpose of forcing him to make a statement, and to punish him for a robbery and shooting of which he had not yet been accused. As this court stated in a somewhat similar case several years ago, "Taking the law into one's own hands is precisely what the legal system attempts to prevent. Any police officer, sworn to uphold the law, must know this basic concept." *Sweatt,* 876 F.Supp. at 1578.

The only genuine legal issue with respect to Calhoun's excessive-force claim is whether Calhoun was protected by the Fourth Amendment, as an arrestee, or the Fourteenth Amendment, as a pretrial detainee, at the moment the force was alleg-

edly inflicted. This marginal uncertainty as to Calhoun's legal status during the events in question does not entitle Thomas and Wheeler to qualified immunity. Even if they mistakenly believed that Calhoun was protected under the Fourteenth Amendment at the time the force was inflicted and not the Fourth Amendment, as this court has concluded, their actions still violated clearly established law.

Taken as true, Calhoun's version of events indicates that Thomas and Wheeler explicitly *told* him they were going to make him miserable until he gave them a statement about the robbery and shooting, and *told* him they wanted him to suffer. There is no question that by such statements and actions, they indicated an express desire to punish Calhoun.

Both the Supreme Court and Eleventh Circuit have repeatedly held that if "officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (discussing excessive force in Eighth Amendment context); *see also Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Skrtich v. Thornton,* 280 F.3d 1295 (11th Cir.2002).[35] At the time of the events in question, the Supreme Court had specifi-

cally stated that " under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535–536, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). Thus, *Bell's* prohibition on *any* pretrial punishment, "defined to include conditions imposed with an intent to punish," should have made it obvious to Thomas and Wheeler that, even if they thought he was a pretrial detainee, assaulting Calhoun for the purpose of forcing him to confess and making him suffer was unconstitutional. *See McMillian v. Johnson,* 88 F.3d 1554 (11th Cir.1996) (holding that placing an inmate on death row before he was tried violated inmate's due process rights if done for the purpose of punishment).[36]

Thus, the abundance of Eleventh Circuit and Supreme Court case law compels the conclusion that, adopting Calhoun's version of events as true, Sheriff Thomas and Deputy Wheeler violated his clearly established constitutional right, regardless of whether that right is identified as a Fourth Amendment right to be free from unreasonable seizures or a Fourteenth Amendment substantive due process right. Even if Calhoun was in fact protected under the Fourteenth Amendment rather than the Fourth Amendment at the time the alleged events occurred—or even if the officers

---

**35.** Although these cases discuss excessive-force claims in the context of the Eighth Amendment, the Supreme Court has held that "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *see also Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir.1985) ("Certainly states may not impose on pretrial detainees conditions that would violate a convicted prisoner's eighth amendment rights").

**36.** The fact that Calhoun may not have suffered visible injuries as a result of the alleged

application of force does not alter this conclusion. In *Whitley,* the Supreme Court held that "the question whether the measure taken inflicted unnecessary and wanton pain and suffering" ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." 475 U.S. at 321, 106 S.Ct. at 1085. Although the extent of the injury suffered is relevant to this ultimate determination, it carries little or no weight under these circumstances, where there was clearly no need to maintain or restore discipline, and Thomas and Wheeler allegedly explicitly verbalized their punitive, sadistic intentions.

themselves were unclear as to Calhoun's legal status—qualified immunity is inappropriate under the circumstances alleged.

### d. Sufficiency of the evidence

█ Because this case is before the court on a summary-judgment motion, the court must also determine, drawing all evidence and inferences in Calhoun's favor, whether there is enough evidence in the record to support the conclusion that the alleged conduct did indeed occur. Other than Calhoun's own affidavit in response to Sheriff Thomas and Deputy Wheeler's motion, there is not much evidence to support his version of events. However, this is understandable and not surprising, given that, aside from Thomas and Wheeler, Calhoun himself was the only witness to the events that occurred in the interrogation room. Furthermore, Thomas and Wheeler have not introduced sufficient affirmative evidence to render Calhoun's version of events unbelievable as a matter of law.

Indeed, Thomas and Wheeler do not affirmatively present an alternative narrative. Instead, they say the court should infer that any force used was necessarily de minimus and therefore did not rise to the level of a constitutional violation based on two facts in the record: (1) Dr. Adolfo Robledo, the emergency room physician who subsequently examined Calhoun's gunshot wound several hours after the interrogation, did not see any other visible injuries or marks on Calhoun,[37] and (2) Calhoun did not mention any injuries sustained from the alleged force to Dr. Robledo.[38]

This argument fails for three reasons. First, Dr. Robledo himself acknowledged in deposition testimony submitted that his primary purpose that evening was to evaluate and treat Calhoun's gunshot wound, and that he did not conduct a thorough physical examination of Calhoun.[39] Thus, drawing all inferences in favor of Calhoun, it is quite possible that he sustained injuries from the challenged application of force that went undetected by Dr. Robledo. Furthermore, Calhoun was under no obligation to disclose Thomas and Wheeler's' alleged abuse to the emergency room physician examining his gunshot wound. Calhoun may have elected not to tell Dr. Robledo about the treatment he suffered at Thomas and Wheeler's hands for any number of reasons. The fact that he did not disclose to the doctor the events that occurred in the interrogation room is in no way conclusive evidence, as a matter of law, that these events did not occur.

Second, the photographs Thomas and Wheeler took of Calhoun's arm at the conclusion of his interrogation session show that his arm was severely swollen and discolored.[40] Again drawing all reasonable

---

**37.** Defendants' brief (Doc. No. 78), p. 13.

**38.** *Id.*

**39.** In Dr. Robledo's deposition testimony, the following exchange occurred:

"Q: Okay. When you evaluate and take a history of a patient—and in this particular case, Mr. Calhoun—do you also look him over to see if there are any other problems with him such as cuts, bruises, or other problems like that?

"A: We—if they complained of the arm and nothing else, we don't do it specifically, because we do, like, a very brief general exam, you know, listen to their heart and lungs. And then we look at the areas of complaint. If they complain, you know, something hurt in any other place, then we take a look. We just basically take the clothes off and then take a look and see if there's anything else that we need to do, but if—well, as a general rule, you know, if they don't complain about nothing else, we just don't, you know, check the leg or their other arm or their back, only the specific complaint."

Defendants' evidentiary submission (Doc. No. 84), Excerpts from Deposition of Dr. Adolfo Robledo, Ex. 42, pp. 12–13.

**40.** Defendants' evidentiary submission (Doc. No. 84), Exs. 20 & 21.

inferences in favor of Calhoun, there is at least a triable issue of fact as to whether the swelling of Calhoun's arm was partially attributable to the force allegedly used by Thomas and Wheeler.

■ Third, even if the force inflicted did not result in physical injuries, Thomas and Wheeler are not automatically shielded from liability here. It is true that the Eleventh Circuit has held that "the application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir.2000). However, under the circumstances alleged in this case, the use of *any* force against Calhoun, even that which did not leave a visible mark, was inappropriate. *Ikerd,* 101 F.3d at 434; *see also Thornton v. City of Macon,* 132 F.3d 1395, 1400 (11th Cir.1998) (the use of any force was unreasonable against plaintiff who was not suspected of having committed a serious crime, did not pose an immediate threat to anyone, and did not actively resist arrest).

Thomas and Wheeler also note that "no allegations of excessive force or abusive treatment" were mentioned when Calhoun entered into a plea agreement with the government in his criminal case.[41] In bringing this matter to the court's attention, they appear to be arguing that Calhoun's silence when entering into the plea agreement is evidence that the excessive force did not occur. In addition, they mention in their brief that Calhoun filed two motions to suppress in his criminal trial, which were denied by the state court.[42] Although they do not explicitly argue this point, they seem to be suggesting that Calhoun should be collaterally estopped from bringing a § 1983 excessive-force action against them because the issue of excessive force was already conclusively resolved in their favor in the state court criminal proceeding.

To the extent that Thomas and Wheeler are making these arguments, the court disagrees. As discussed above, Calhoun's silence as to the alleged force he endured is not evidence that such force did not occur. As for Calhoun's previous motions to suppress, the court notes that the issue of whether Thomas and Wheeler subjected Calhoun to excessive force was neither explicitly raised nor ruled upon in the state-court proceeding.[43]

In sum, Calhoun has alleged a version of events which, if true, rise to the level of a violation of his constitutional right that was clearly established at the time of the

41. *Id.*

42. Defendants' brief (Doc. No. 78), p. 13.

43. Calhoun's first motion to suppress, filed by his defense attorney, did not specifically seek to suppress his confession on the grounds that it was coerced; rather, it sought to suppress his statements based on deficiencies in the waiver of rights forms he signed. Thomas and Wheeler have not produced any evidence indicating that the state court ruled on any issues arising from that motion that pertained to the force allegedly used against Calhoun.

Calhoun's second motion, filed *pro se,* was entitled "Motion Produce on Grounds Proof Error's To Get Case Dismiss By Me Been Unlawful Arrested On Oct. 19, 2001 On Grounds Proof Serious Un-lawful Violation's Was Did To Me By Sheriff Russell, Frank Wheeler Befor [sic] Arrest, In Arrest and After Un–Lawful Arrest," which the state court interpreted as a motion to dismiss and/or suppress. Defendants' evidentiary submission (Doc. No. 84), Exs. 7 & 10. Calhoun did raise some of the same allegations in this motion as he does in his present complaint. However, the state court simply categorically denied his motion without explanation.

By issuing this general, blanket denial, the state court did not make any specific findings as to whether Calhoun was subjected to excessive force during his interrogation. Thus, this court finds that Calhoun's excessive-force claim is not collaterally estopped.

incident. Accordingly, Sheriff Thomas and Deputy Wheeler are not entitled to qualified immunity on the excessive-force claim. Furthermore, drawing all inferences in favor of Calhoun, there is sufficient evidence in the record to create a triable issue of fact on the excessive-force claim.

## B. Denial of Medical Treatment

Calhoun claims that Sheriff Thomas and Deputy Wheeler failed to provide him with adequate medical care in two ways.

First, he alleges that on October 19, 2001, Thomas and Wheeler failed to seek medical care for his wounded left arm until he had been in their custody for over six hours. Calhoun states that while they were interrogating him, they were well aware of the fact that he was suffering from a gunshot wound in his left arm and that he had not yet sought medical treatment. Indeed, a transcript of one of the interrogation sessions indicates that they knew of his injury. During Thomas and Wheeler's interrogation of Calhoun, the following exchange occurred:

> "Thomas: Have you been to the doctor with your arm?
> "Calhoun: No.
> "Thomas: Were you afraid to go?
> "Calhoun: No.
> "Thomas: It looks like you would be in a lot of pain. It is swollen severe.
> "Calhoun: A little bit." [44]

Thomas and Wheeler also photographed Calhoun's wounded arm.[45] Calhoun claims that, while he was being interrogated, he repeatedly pleaded with Thomas and Wheeler to take him to the hospital so that he could receive medical care.[46] However, he states that they refused to do

so until he cooperated and made an incriminating statement, telling him that he needed to suffer like the victim of the shooting and robbery had suffered.[47] Calhoun alleges that even after Thomas and Wheeler arrested him at the conclusion of the interrogation session, they further delayed seeking medical care for his arm by first conducting a search of his grandmother's house. Calhoun states that he was not taken to a hospital until after midnight on October 20, 2001, approximately six hours after he arrived at the Pike County Sheriff's Department for questioning.[48]

The second aspect of Calhoun's inadequate medical-treatment claim is that Thomas and Wheeler intentionally ignored the deteriorating state of his arm during his detention at the Pike County Jail over the course of the ensuing weeks.

Calhoun claims that during his period of pretrial detention at the jail, Thomas and Wheeler bribed him by extracting information from him about the robbery and murder in exchange for the promise of medical treatment. For example, he states that Thomas told him that he would deprive Calhoun of medical care and cause him to lose his arm unless he provided assistance in locating the firearm that had been used in the robbery.[49] Calhoun was seen by a doctor for his arm on three separate occasions during this time period, and states that Thomas and Wheeler instructed those doctors not to prescribe him pain medication or conduct surgery on those occasions.[50] Calhoun further alleges that they ignored his pleas for pain medication for his arm. He alleges that he did not receive proper medical care or treat-

---

44. Defendants' evidentiary submission (Doc. No. 84), Ex. 2, p. 13.

45. *Id.*, Exs. 20 & 21.

46. Plaintiff's affidavit (Doc. No. 25), p. 7.

47. *Id.*

48. *Id.* at 15.

49. *Id.* at 18.

50. *Id.* at 20–21.

ment until he was transferred to the Montgomery County Jail in early December to appear before a judge on a probation violation.[51] Calhoun claims that in the Montgomery jail a nurse told him he needed surgery or else he would lose his arm.[52] He finally underwent surgery and had the bullet removed from his arm on December 31, 2001.[53]

For the following reasons, the court finds that Calhoun has presented sufficient evidence to support his claim that he was denied adequate medical treatment on the night of October 19, 2001. However, Calhoun has failed to present sufficient evidence that he received inadequate treatment during his confinement in the Pike County Jail subsequent to his arrest. The court will first discuss the standard for analyzing inadequate medical-treatment claims, and will then apply that standard to the facts alleged in Calhoun's two medical-treatment claims.

### i. Deliberate indifference standard

 Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment Due Process Clause, rather than the Eighth Amendment Cruel and Unusual Punishment Clause. *Cottrell,* 85 F.3d at 1490 (citing *Bell v. Wolfish,* 441 U.S. 520, 535, n. 16, 99 S.Ct. 1861, 1872, n. 16, 60 L.Ed.2d 447 (1979)). *See also Lancaster v. Monroe County,* 116 F.3d 1419, 1425, n. 6 (11th Cir.1997). However, the applicable standard of review is identical, so "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." 85 F.3d at 1490.

As an arrestee, and later, as a pretrial detainee, Calhoun was entitled to receive treatment for his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct.

285, 50 L.Ed.2d 251 (1976). To properly allege a constitutional violation based on failure to provide adequate medical care, a detainee "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292.

"Deliberate indifference" requires that the official know of and disregard an excessive risk to inmate health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). The official "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (emphasis added). Deliberate indifference contemplates a state of mind more blameworthy than negligence. *Id.* at 835, 114 S.Ct. at 1978.

A "serious medical condition" is an objectively serious medical need that, if left unattended, poses a serious risk of harm. *Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir.2000). The condition must have either been diagnosed by a physician as mandating treatment or be "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187 (11th Cir.1994).

### ii. The events of October 19, 2001

 There is sufficient evidence in the record to conclude that Calhoun's gunshot wound constituted a "serious medical condition" when he came into the custody of Thomas and Wheeler on October 19, 2001, such that even a lay person would recognize the need for a doctor's attention. Calhoun states in his affidavit that he was shot in the arm two days before the incidents in question, and that he had not yet sought medical care for the injury.[54] The

---

**51.** *Id.* at 24–25.

**52.** *Id.*

**53.** *Id.* at 27.

**54.** Plaintiff's affidavit (Doc. No. 25), p. 3.

photographs taken of Calhoun's arm on that night indicate a circular tear in his flesh, and demonstrate that his arm was severely swollen and discolored from the wound. Based on these photographs, the court concludes that the condition of Calhoun's arm on the night in question was so noticeable that it would have been obvious to even a casual observer that he needed medical attention.

Furthermore, the evidence in the record reflects that Thomas and Wheeler had *actual knowledge* of the wound and were aware of the seriousness of the wound. During Calhoun's interrogation, Thomas discussed Calhoun's injury with him and noted, "It looks like you would be in a lot of pain. It is swollen severe." [55] In addition, Thomas and Wheeler obviously thought Calhoun's injury was serious enough to take photographs of it after they finished questioning him.

Moreover, Calhoun states that he not only requested medical care during his interrogation, but that Thomas and Wheeler refused to given him any, and even assaulted him on his injury, so as to force him to confess and to punish him for the robbery. [56] Thus, if Calhoun is to be believed, Thomas and Wheeler thought his injury was serious enough such that they could use the denial of medical treatment as an effective tool to punish him and to force him to confess.

Finally, there is ample, undisputed evidence in the record reflecting the fact that there was approximately a six-hour delay between the time Calhoun came into Thomas and Wheeler's custody and his arrival at the hospital. Calhoun signed his first Miranda waiver at 6:40 p.m. on October 19, 2001. [57] The medical records from Edge Regional Medical Center indicate that he was admitted at 12:35 a.m. on October 20, 2001. [58]

This delay, in light of Thomas and Wheeler's actual knowledge of the wound and their alleged conscious, and even malicious, refusal to treat it, is sufficient to present a triable issue of fact as to whether their conduct reflected deliberate indifference to his serious medical needs. *See Cooper v. Dyke,* 814 F.2d 941, 945–46 (4th Cir.1987) (detainee's repeated pleas to officers for medical attention due to gunshot wound was sufficient evidence of deliberate indifference to warrant submitting claim to jury).

### iii. Calhoun's confinement at Pike County Jail

 While Calhoun's gunshot wound continued to constitute a "serious medical need" after his initial visit to the doctor such that it required additional treatment,

---

**55.** Defendants' evidentiary submission (Doc. No. 84), Ex. 2, p. 13.

**56.** Calhoun states in his affidavit,

"Sheriff [Thomas] got a good hold of my neck ... started choking me telling me that I was going to make a statement [incriminating] myself on the robbery [and] shooting [that] went down on October 17, 2001. He said because victim his buddy ... I was going to talk, I said no! ... Sheriff [Thomas] said to me victim should of shot me in the head, then he punched my left gunshot wound made pain [sic]. Also my wounded gunshot left arm started back bleeding that I started crying, begging them to leave me

alone because they hurted me and I started begging them to take me to a hospital because my arm started hurting, looking very bad that I needed medical treatment care! "Sheriff [Thomas] told me that victim suffering, looking to die that he didn't care about me suffering or was not going to get me to no hospital to get medical treatment care that I really needed unless I went on made statement that they wanted first!" Plaintiff's affidavit (Doc. No. 25), pp. 7–8.

**57.** *Id.,* Pike County Sheriff's Department Waiver of Rights Form, Ex. 1.

**58.** *Id.,* Edge Regional Medical Center Summary Sheet, Ex. 29.

Calhoun has not presented sufficient evidence to create a triable issue of fact as to whether Thomas and Wheeler were deliberately indifferent to this need while he was detained in the Pike County Jail.

Viewed in the light most favorable to Calhoun, the evidence in the record indicates that he was seen regularly by doctors during the weeks following his arrest. His arm was examined by Dr. Darrell J. Potter on October 24, 2001, as a follow-up visit to Dr. Robledo's emergency room examination on October 19.[59] He was also seen by Dr. Potter on November 16, 2001, and November 28, 2001.[60] The record contains medical records indicating that although Calhoun did tell Dr. Potter he was in pain and that he was suffering from some swelling, Dr. Potter was of the opinion that Calhoun's arm was healing properly and without infection.[61] Pike County Jail records contained in the record show that the jail gave Calhoun his prescription antibiotic, Cephalexin, on a daily basis, and also periodically dispensed Advil and other pain relievers to him.[62]

While Calhoun alleges that Thomas and Wheeler interfered with his ability to receive medical treatment by instructing his doctors not to give him pain medication and not to perform surgery on him, there is no evidence in the record to support that assertion. To the contrary, Calhoun's doctors explicitly state in deposition testimony contained in the record that Thomas and Wheeler never instructed them not to prescribe pain medication for Calhoun or otherwise interfered with their treatment of him.[63] Dr. Potter states that he did not prescribe Calhoun pain medication or recommend surgery because he was of the opinion that neither was necessary.[64]

Finally, the record contains the deposition testimony of Dr. John Crosby, who operated on Calhoun's arm on December 31, 2001. Dr. Crosby testified that, although Calhoun was suffering from an arterial injury at the time of the surgery, such an injury did not necessarily imply that he had not been receiving adequate medical care up until that point.[65]

In sum, the record indicates that Thomas and Wheeler saw that Calhoun had regular medical visits and administered medication as directed by Calhoun's doctors. Other than Calhoun's bald allega-

**59.** *Id.*

**60.** *Id.*, Ex. 31.

**61.** For example, Dr. Potter's notes for November 28, 2001, state,

"Patient ... is complaining of aching discomfort associated with his exercise program. He is apparently trying to do that frequently during the day but not being as vigorous as what I would like. His range of motion has improved significantly since his last visit ... There is no evidence of infection."

*Id.*

**62.** Defendants' evidentiary submission in support of special report (first motion for summary judgment) (Doc. No. 16), Ex. 1.

**63.** *Id.*, Excerpts from Deposition of Darrell J. Potter, M.D., Ex. 42, at 25.

**64.** *Id.* at 27–28.

**65.** At the deposition, the following exchange occurred between **Thomas and Wheeler's** lawyer and Dr. Crosby:

"Q: Okay. So if I understand you, the fact that he may have been shot some two months earlier really didn't mean that he wasn't getting adequate medical care up until the time you saw him?

"A: Not at all.

"Q: Because the particular thing or the particular trauma that you treated him for was something that might not have manifested or showed itself until the time you saw him?

"A: Right. Peripheral arterial injuries can present with delayed findings months or even years after the initial injury."

*Id.*, Excerpts from Deposition of John W. Crosby, M.D., Ex. 42, p. 10.

tions, there is no evidence in the record to support the contention that Thomas and Wheeler were deliberately indifferent to his medical needs by intentionally denying or delaying his access to medical care, or by interfering with his treatment as it was prescribed. *Estelle,* 429 U.S. at 104–105, 97 S.Ct. at 291. Thus, summary judgment is appropriate on this medical-treatment claim.

### C. Conditions of Confinement

Calhoun alleges that after being booked in the Pike County Jail, he was not given shower shoes, a toothbrush, or clean clothes.[66] He states that he contracted crabs (pubic lice) and athlete's foot as a result of the unsanitary conditions at the jail, and suffered from bleeding feet as a result of showering without shower shoes.[67] In addition, he claims he was subject to unconstitutional conditions of overcrowding, as he was placed as the third person in a two-person cell and was made to sleep on the floor.[68]

The court concludes that summary judgment is due to be granted on Calhoun's conditions-of-confinement claim.

### i. Eighth/Fourteenth Amendment standard

■ The Constitution "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). Thus, it is well-settled that the treatment a prisoner receives and the conditions under which he is confined are subject to constitutional scrutiny. *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The Eleventh Circuit has held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care, the minimum standard allowed by the due process clause is the same as that allowed by the Eighth Amendment for convicted persons." *Hamm v. DeKalb County,* 774 F.2d 1567 (11th Cir.1985). Therefore, the court must look to the Eighth Amendment to analyze Calhoun's claim.

■ The Eighth Amendment "does not authorize judicial reconsideration of every governmental action affecting the interests or well-being of a prisoner." *Miller v. King,* 384 F.3d 1248, 1260 (11th Cir.2004) (internal quotations omitted) (quoting *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)). Prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain. *Hope v. Pelzer,* 536 U.S. 730, 737, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002); *Farrow v. West,* 320 F.3d 1235, 1242 (11th Cir.2003).

■ In order to demonstrate an Eighth Amendment violation with respect to conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Miller,* 384 F.3d at 1261. Under the objective inquiry, he must prove that he was denied the "minimal civilized measure of life's necessities." *Id.* (quoting *Chandler v. Crosby,* 379 F.3d 1278, 1289–90 (11th Cir.2004)). The challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to his future health." *Chandler,* 379 F.3d at 1289–90. Under the subjective component, the prisoner must prove that the prison official acted with "deliberate indifference" in disregarding that risk. *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

---

66. Plaintiff's affidavit (Doc. No. 25), p. 17.

67. *Id.* at 24.

68. *Id.* at 17.

## ii. Calhoun's claim

Calhoun's allegation that he was deprived of shower shoes, clean clothes, and a toothbrush upon his arrival at the Pike County Jail does not rise to the level of a constitutional violation. While the court recognizes that the deprivation upon arrival of toiletries may have been uncomfortable for Calhoun, and to some degree unsanitary, it cannot be said that this is an "extreme" prison condition that posed "an unreasonable risk of serious damage to his future health." *Chandler*, 379 F.3d at 1290. The same is true for Calhoun's allegations that he contracted crabs and athlete's foot, and suffered from bleeding feet. *Landfair v. Sheahan*, 878 F.Supp. 1106, 1112–13 (N.D.Ill.1995) (Aspen, J.) ("While no doubt uncomfortable, athlete's foot cannot be considered an injury serious enough" to rise to an Eighth Amendment violation). Because Calhoun's claim as to these items fails on this first, objective inquiry, the court need not reach the question of whether Thomas and Wheeler acted with deliberate indifference in failing to provide these items for Calhoun.

In addition, Calhoun's claim that he was made to sleep on the floor as the third person in a two-person cell is not sufficient, without more evidence, to allege a constitutional violation. It is clear that conditions of overcrowding are not necessarily unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981) (double-celling of inmates not *per se* unconstitutional); *Hamm*, 774 F.2d at 1575 (the fact that pretrial detainee temporarily had to sleep upon a mattress on the floor or on a table "is not necessarily a constitutional violation"). Thus, to state a valid constitutional claim, Calhoun must demonstrate that the overcrowding at the Pike County Jail, in light of overall prison conditions, was "extreme" such that it "deprived him of a human necessity such as food, medical care, and sanitation." *Hamm*, 774 F.2d at 1575.

Calhoun has not alleged, nor has he provided any evidence, that the overcrowding at the jail resulted in the deprivation of such a necessity. Furthermore, he has not provided the court with any evidence on other issues relevant to the constitutional inquiry here, such as the amount of space each inmate is allotted, or the amount of time inmates remain in their cells each day. The court recognizes that Calhoun is proceeding in this lawsuit *pro se*, and understands that his confinement might well inhibit his ability to gather information. Nevertheless, in the absence of any such evidence, the court must conclude that Calhoun has failed to establish a triable issue of fact as to whether the overcrowding at the Pike County Jail violated his constitutional rights.

## IV. CONCLUSION

For the reasons given above, it is ORDERED as follows:

(1) Defendant Russell Thomas and Frank Wheeler's motion for supplemental summary judgment (Doc. No. 84) is denied with respect to plaintiff Derrick T. Calhoun's excessive-force claim and his medical needs claim that relates to the incidents of October 19, 2001.

(2) Said motion is granted in all other respects.

(3) This case will proceed to trial on only plaintiff Calhoun's excessive-force claim and his medical needs claim that relates to the incidents of October 19, 2001.